# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### FORT WORTH DIVISION

| | |
|---|---|
| Dallas Mudd, <br><br>       Plaintiff, <br><br>   v. <br><br> National Labor Relations Board, Lauren McFerran, in her official capacity as Chairwoman of the National Labor Relations Board, Marvin Kaplan, Gwynne Wilcox, and David Prouty, in their official capacities as Board Members of the National Labor Relations Board <br><br>      Defendants. | Civil Action No. <br><br> COMPLAINT FOR PRELIMINARY INJUNCTIVE AND DECLARATORY RELIEF |

## INTRODUCTION

1.  The Supreme Court found in *Seila Law LLC v. CFPB*, 140 S. Ct. 2183 (2020) and *Collins v. Yellen*, 141 S. Ct. 1761 (2021) that under Article II of the Constitution, the President must be able to remove federal officials who exercise substantial executive power. *See also Free Enterprise Fund v. PCAOB*, 561 U.S. 477 (2010).

2.  The structure of the National Labor Relations Board (NLRB or Board) does not comply with this constitutional mandate.

3.  Article II, Section 1 of the Constitution vests in the President all executive power, which includes the power to appoint, supervise, and remove federal officers who exercise executive power.

4.  The five-member NLRB exercises substantial executive power because it issues binding rules, adjudicates unfair labor practices and representation disputes,

issues subpoenas, and seeks preliminary injunctions in federal court to halt unfair labor practices.

5. The National Labor Relations Act (NLRA or Act) limits the President's ability to remove Board members to "neglect of duty or malfeasance in office" and prohibits removal for any other reason. 29 U.S.C. § 153(a). These restrictions are impermissible limitations on the President's ability to remove Board members and violate the Constitution's separation of powers. Thus, the Board's structure is unconstitutional.

6. When a party must appear before an official who is shielded by an unconstitutional removal protection they are "entitled to declaratory relief sufficient to ensure that the [administrative] standards to which they are subject will be enforced only by a constitutional agency accountable to the Executive." *Free Enterprise Fund*, 561 U.S. at 513.

7. Plaintiff Dallas Mudd is an employee of Aunt Bertha, a public benefit company doing business as Findhelp. Mudd is in a bargaining unit of Findhelp employees who are currently represented by a union, Office & Professional Employees International Union (OPEIU).

8. On September 27, 2024, Mudd filed a decertification petition with NLRB Region 16 to seek an election to determine if employees continue to support OPEIU. The petition was supported by more than the "substantial number" of the employees—30%—required to call for such an election. 29 U.S.C. § 159(c)(1)(A); *River City Elevators, Inc.*, 339 NLRB 616 (2003).

9.  In an ideal world, Region 16 would promptly conduct an election. Section 9 of the NLRA states that "[w]henever a petition shall have been filed" if the Board "has reasonable cause to believe that a question of representation affecting commerce exists" it "shall direct an election by secret ballot and shall certify the results thereof." 29 U.S.C. § 159(c)(1)(B).

10.  Unfortunately for Mudd, we do not live in an ideal world. It is unlikely that the NLRB will conduct Mudd's decertification election anytime soon—or possibly ever. This is because Findhelp has been accused by OPEIU of violating the NLRA. OPEIU has filed several different unfair labor practice charges against Findhelp, alleging a number of different labor law violations.

11. Under Board rules a NLRB Regional Director has the power to dismiss employee petitions based on unfair labor practice allegations. This policy has been known as the "blocking charge policy."

12. NLRB Region 16 dismissed Mudd's petition based on these unfair labor practice allegations, and Mudd is appealing that dismissal to the five-Member NLRB.

13. Mudd plans to administratively adjudicate whether his election should be blocked. However, Mudd is entitled have a constitutionally structured Board, properly accountable to the President, hear his arguments. Mudd requests this court preliminarily enjoin the NLRB from acting on his appeal until the constitutional infirmities in the Board's structure have been resolved.

14. Mudd seeks to vindicate his statutory right to an election but wants to ensure his rights are adjudicated in a constitutionally valid proceeding. The only way

to ensure this process comports with the Constitution is to pause that process until he can secure a declaration from this Court that the Board removal protections are unconstitutional.

## JURISDICTION AND VENUE

15. This Court has jurisdiction over this case under Article III of the United States Constitution and 28 U.S.C. § 1331 because Plaintiff's claims arise under the Constitution. *See Axon Enter., Inc. v. FTC*, 143 S. Ct. 890, 903–06 (2023) (holding alternative review scheme does not divest a district court of jurisdiction over a constitutional challenge to an agency's structure); *Free Enterprise Fund*, 561 U.S. at 491 n.2; *Seila Law*, 140 S. Ct. at 2196.

16. Venue is proper in this Court under 28 U.S.C. § 1391(e)(1)(B) because the Board maintains an office in in this district, the decertification petition was filed in this district with the Board's regional office, and a substantial part of the events or omissions giving rise to the claim occurred in this district.

17. Service of process by certified mail upon the persons and entities named in 28 U.S.C. § 1391(e) satisfies the due process requirements for establishing personal jurisdiction over such persons and entities, and this Court therefore has personal jurisdiction over all defendants. *Duplantier v. United States*, 606 F.2d 654, 663 (5th Cir. 1979).

## PARTIES

18. Plaintiff Dallas Mudd is employed by Findhelp and is the petitioner in *Findhelp*, NLRB Case No. 16-RD-351569.

19. Defendant National Labor Relations Board is an agency of the United States. It maintains an office, NLRB Region 16, in Fort Worth, Texas.

20. Defendant Lauren McFerran is Chairwoman of the NLRB. She is sued in her official capacity.

21. Defendant Marvin Kaplan is a Member of the NLRB. He is sued in his official capacity.

22. Defendant Gwynne Wilcox is a Member of the NLRB. She is sued in her official capacity.

23. Defendant David Prouty is a Member of the NLRB. He is sued in his official capacity.

## FACTS

24. Findhelp is a software company that allows users to connect to available social services.

25. On January 23, 2023, OPEIU filed a petition with the NLRB in case number 16-RC-310853, seeking to exclusively represent a group of employees at Findhelp. The employees primarily work in Findhelp's offices in Austin, Texas; Denver, Colorado; and Madison, Wisconsin.

26. On April 11, 2023, by a vote of 95-52, the employees of Findhelp selected the OPEIU to represent them. NLRB Region 16 certified OPEIU as the employee's exclusive representative on April 19, 2023.

27. Mudd is an employee at Findhelp and is represented by OPEIU. Mudd, however, opposes their representation. Mudd started work at Findhelp in January

2024 and did not have an opportunity to vote on whether to be represented by the Union.

28. Mudd came to Findhelp because he was impressed by their generous salary and benefits packages. He doesn't believe a union is necessary when his employer already provides competitive wages and benefits.

29. He has also found the Union to be a divisive force, sowing discord between employees by pitting employees against the company. For example, Findhelp's investors are reported to have received hundreds of boilerplate emails about its contract negotiations with the OPEIU. (Ex C). The CEO of Findhelp also described an attempt by the AFL-CIO, of which OPEIU is an affiliate, to share "misleading" information with one of Findhelp's customers. (Ex. C).

30. Mudd loves working at Findhelp and is a strong supporter of its mission. He does not want to be represented by an organization that is attempting to secure a collective bargaining agreement by haranguing Findhelp's customers and investors. He believes such efforts only undermine the company, its mission, and ultimately the employees.

31. Unsatisfied with OPEIU's representation, for this and other reasons, Mudd and a group of his colleagues collected a decertification petition to oust the union.

32. The NLRB will hold a secret ballot representation election when 30% or more of employees sign a petition asking for an election.

33. After collecting a petition supported by more than 30% of his fellow employees, Mudd filed a decertification petition with NLRB Region 16, docketed as

*Aunt Bertha, a Public Benefit Corporation d/b/a Findhelp*, Case No. 16-RD-351569.

34. The actual possibility of an election is remote, however, because of the NLRB's "blocking-charge" policy. This policy allows unions and the NLRB to unilaterally halt or dismiss decertification petitions based solely on unproven allegations made in unfair labor practice cases.

35. Here, OPEIU has filed several unfair labor practice charges alleging that Findhelp violated the National Labor Relations Act. None of these allegations have been proven in front of an ALJ, much less the Board. Still, the Board's policy allows these allegations to unilaterally halt the election.

36. On October 2, 2024, NLRB Region 16's Director Timothy Watson (Region 16) issued a show cause order asking the parties to submit their positions on whether Mudd's petition should be dismissed pursuant to *Rieth-Riley Construction Co.*, 371 NLRB No. 109 (June 15, 2022), subject to reinstatement, based on the unfair labor practices alleged against Findhelp in Cases 16-CA-319893, 16-CA-329129, 16-CA-311267, 16-CA-312143, 16-CA-313516, 16-CA-318102, 16-CA-318170. (Ex. B).

37. Case 16-CA-329129 alleges Findhelp violated Sections 8(a)(1) and (5) of the Act by refusing to bargain with the union when it changed its health insurance provider from Aetna to Cigna. (Ex. A).

38. Case 16-CA-319893 alleges Findhelp violated Sections 8(a)(1) and (5) of the Act by refusing to bargain with the union when it decided to use a vendor other than Grubhub to provide employees' free meals.  (Ex. A).

39. Cases  16-CA-311267,  16-CA-312143,  16-CA-313516,  16-CA-318102,  16-

CA-318170 have been consolidated into a single administrative Complaint. The Complaint alleges that Findhelp: (1) gave employees an unlawful impression it was surveilling union activity; (2) maintained and enforced an unlawful solicitation and distribution policy; (3) prohibited employees from talking about the union during working time; (4) discharged three employees between January 23 and February 10, 2023; and (5) maintains unlawful severance agreements with non-disparagement confidentiality, and cooperation clauses. (Ex. B).

40. On October 9, 2024, Region 16 dismissed Mudd's decertification petition. Region 16 dismissed because it will seek an affirmative bargaining order to remedy the failure-to-bargain allegations in Cases Case 16-CA-329129 and 16-CA-319893. Alternatively, it found dismissal was proper because the allegations in the seven unfair labor practice cases were of the type that would cause employee disaffection from the union. *See Master Slack*, 271 NLRB 78 (1984).

41. Region 16 ignored most of the allegations used to block the election, under its alternative *Master Slack* rationale, occurred in January and February 2023—only months prior to OPEIU winning the NLRB-conducted April 2023 election. Nor did it explain how those unfair labor practice allegations would not bar the April 2023 election but would prevent Mudd's decertification election.

42. Region 16 dismissed Mudd's petition subject to reinstatement. Reinstatement is a do-over—the petitioner has the right to ask the Region to process the petition after the unfair labor practice allegations are resolved. Section 11733.1(a)(2) of the Board's Casehandling Manual states: "[i]f the Regional Director

finds merit to charges involving violations of Section 8(a)(1), (2), (3), (5), or 8(b)(3), and the nature of the alleged violations, if proven, would condition or preclude the existence of a question concerning representation, the petition should be dismissed with a dismissal letter setting forth the specific connections between the alleged unfair labor practice allegations and the petition, subject to a request for reinstatement by the petitioner after final disposition of the charge."

43. Mudd also has a right of appeal to the five-Member NLRB, called a Request for Review, which he will exercise. Mudd's Request for Review is currently due November 5, 2024.

44. Even if the Board rejects Mudd's Request for Review, he is not going away. Mudd and the other employees who signed his petition oppose OPEIU's representation. Mudd will file a request for reinstatement of the petition at the conclusion of the unfair labor practice cases blocking his election. And even if the Board refuses to conduct an election—because of new unfair labor practice allegations or for some other reason—Mudd will continue to petition the Board for an election until one is granted.

## LEGAL BACKGROUND

### I. The Removal Power

45. Article II gives the President "the general administrative control of those executing the laws," which includes the "power of removing those for whom he cannot continue to be responsible." *Myers v. United States*, 272 U.S. 52, 117, 164 (1926).

46. The Supreme Court recognizes this removal power is impermissibly

restrained by statutes that limit the President's ability to remove an executive official, either by restricting who can remove, or limiting the rationale for removal. *See Free Enterprise Fund*, 561 U.S. at 495; *Seila Law*, 140 S. Ct. at 2192; *Collins*, 141 S. Ct. at 1783–84.

47. The Supreme Court found two narrow exceptions to this rule of plenary removal power. First, in *Humphrey's Executor v. United States*, 295 U.S. 602 (1935), the Court upheld a statute that prohibited the removal of Federal Trade Commission Commissioners except for "inefficiency, neglect of duty, or malfeasance in office," *id.* at 619–20 (quoting 15 U.S.C. § 41). It did so because it believed the Federal Trade Commission Commissioners exercised only quasi-legislative and quasi-judicial authority, and did not exercise any "executive power in the constitutional sense." *Id.* at 628.

48. Second, *Morrison v. Olson*, 487 U.S. 654 (1988), and *United States v. Perkins*, 116 U.S. 483 (1886), recognized an exception for "inferior officers with limited duties and no policymaking or administrative authority." *Seila Law*, 140 S. Ct. at 2200.

49. In *Seila Law*, the Court reaffirmed the fundamental separation of powers principle that the President must be free to remove executive officers at will, with only "two exceptions—one for multimember expert agencies that do not wield substantial executive power, and one for inferior officers with limited duties and no policymaking or administrative authority." *Seila Law*, 140 S. Ct. at 2199–2200.

50. The *Humphrey's Executor* exception does not apply to the NLRB because its

members wield substantial executive power and are exercising this power over Mudd's employment.

## II.    The National Labor Relations Board

51. The NLRB is a federal regulatory agency whose authority has been delegated by Congress through the NLRA.

52. The NLRB consists of no more than five Board Members who are appointed to staggered, five-year terms by the President, with the advice and consent of the Senate. 29 U.S.C. § 153(a). Under NLRA Section 3, Board Members are removable by the President only "upon notice and hearing" for "neglect of duty or malfeasance in office, but for no other cause." *Id.*

53. The Board exercises substantial executive authority though its prosecutorial, rulemaking, policymaking, and adjudicatory authority.

54. The Board has the executive power to appoint the "executive secretary, and such attorneys, examiners, and regional directors, and such other employees as it may . . . find necessary for the proper performance of its duties." 29 U.S.C. § 154; *see also* U.S. Const. art. II. § 2, cl. 2 ("Congress may by Law vest the Appointment of such inferior Officers, as they think proper, . . . in the Heads of Departments."). Through this authority, the Board appoints Regional Directors, who oversee the NLRB's twenty-six regional offices and its ALJs, who oversee adjudications.

55. The Board has the executive power to "prevent any person from engaging in any unfair labor practice . . . affecting commerce," which entails authority to conduct administrative adjudications and exact consequential remedies from

employers and unions. 29 U.S.C. § 160.

56. The Board has the executive power to issue subpoenas. 29 U.S.C. § 156; 29 CFR § 102.31.

57. The Board has the executive power to engage in rulemaking. 29 U.S.C. § 156.

58. The Board has the executive power to conduct union representation elections, adjudicate representation election disputes, and issue and revoke certifications of labor organizations. 29 U.S.C. § 159.

59. A Board certification grants a union massive power: the sole ability to negotiate the covered employees' wages, hours, and other conditions of employment. This power is "comparable to those possessed by a legislative body both to create and restrict the rights of those whom it represents." *Steele v. Louisville & Nashville R.R., Co.*, 323 U.S. 192, 202 (1944).

60. The Board's power over representation proceedings is almost plenary because its decisions in such cases are not directly reviewable in federal court, except in narrow circumstances. *Leedom v. Kyne*, 358 U.S. 184, 190 (1958) (limiting review to "agency action taken in excess of delegated powers.").

61. In representation cases, Board Members delegate their powers to NLRB Regional Directors to investigate petitions, adjudicate representation disputes, hold elections, and issue certifications. Board Members typically review appeals (called Requests for Review) from Regional Director decisions.

62. When confronted with a representation petition, a NLRB Regional Director

has the power to dismiss, or hold in abeyance, employee petitions based on unfair labor practice allegations against employers or unions. This policy has been known as the "blocking charge policy."

63. This policy allows a party to halt an election indefinitely by filing unfair labor practice charges against employers. Blocking charges can delay a petitioned-for election for months, or even years, if the election is allowed at all.

64. Courts of appeals have criticized the blocking charge policy's adverse impact on employee free choice and noted its potential for abuse and manipulation by incumbent unions seeking to avoid a challenge. *NLRB v. Hart Beverage Co.*, 445 F.2d 415, 420 (8th Cir. 1971); *Templeton v. Dixie Color Printing Co.*, 444 F.2d 1064, 1069 (5th Cir. 1971); *NLRB v. Midtown Serv. Co.*, 425 F.2d 665, 672 (2d Cir. 1970); *NLRB v. Minute Maid Corp.*, 283 F.2d 705, 710 (5th Cir. 1960); *Pacemaker Corp. v. NLRB*, 260 F.2d 880, 882 (7th Cir. 1958).

65. In 2014, the Board engaged in rulemaking to update and codify its blocking charge policy through the rulemaking process. Representation—Case Procedures, 79 Fed. Reg. 74308 (Dec. 15, 2014).

66. Based on widespread criticism of the blocking charge policy, in 2020, the Board eliminated this policy in its "Election Protection Rule." 85 Fed. Reg. 18366 (April 10, 2020). The Board was required to direct an election and tally the ballots notwithstanding the pendency of unfair labor practice charges. *Id. See also* 29 C.F.R. § 103.20(b).

67. In comments adopting the final Election Protection Rule, the Board found

"the final-rule amendment provides that a blocking-charge request will no longer delay the conduct of an election in any case." 85 Fed. Reg. at 18,375.

68. Despite the Election Protection Rule disposing of the blocking charge policy, the Board effectively revived that policy through administrative adjudication. In *Rieth-Riley Construction Co*, 371 NLRB No. 109 (June 15, 2022), the Board held Regional Directors still possess the power to dismiss election petitions if they have found merit to unfair labor practice allegations that "if proven, would interfere with employee free choice in an election, and is inherently inconsistent with the petition itself." *Id.* slip op. at *3 (cleaned up).

69. Under *Rieth-Riley*, if a Regional Director finds merit to an alleged unfair labor practice charge, he can effectively block an election by dismissing the petition— the opposite of what the Election Protection Rule requires.

70. The current Board majority repealed the Election Protection Rule effective October 1, 2024, 89 Fed. Reg. 62952 (Aug. 1, 2024). The Board reinstituted its prior policy of blocking all decertification elections when there are pending unfair labor practice allegations that may affect employee free choice.

71. Mudd's decertification petition was filed just prior to the effective date of the Board's 2024 rule reinstating the old blocking charge policy. Regardless, NLRB Region 16 dismissed Mudd's petition subject to reinstatement under *Rieth-Riley Construction Co*, 371 NLRB No. 109.

72. Mudd is appealing Region 16's decision to the five-member Board. However, if the Board denies his appeal, he has no avenue to challenge the Board's decision

because there is no direct right of appeal to a federal court.

73. Mudd, and his other coworkers who signed his petition, have been "thrust unwillingly into an agency relationship" with a union they do want and cannot remove because the NLRB will not grant them an election. *Mulhall v. UNITE HERE Loc. 355*, 618 F.3d 1279, 1287 (11th Cir. 2010).

74. Mudd's associational right to be free of a union he does not want to represent him, and his statutory right to seek an election, are dependent on an agency wielding immense executive power whose members are unaccountable to the President.

## COUNT I – BOARD MEMBERS ARE UNCONSTITUTIONALLY INSULATED FROM REMOVAL

75. Article II of the Constitution provides that "[t]he executive Power shall be vested in [the] President," U.S. Const. art. II, § 1, cl. 1, and that he must "take Care that the Laws be faithfully executed," *id.* art. II § 3. "In our constitutional system, the executive power belongs to the President, and that power generally includes the ability to supervise and remove the agents who wield executive power in his stead." *Seila Law*, 140 S. Ct. at 2211.

76.  This removal power cannot be restricted by Congress, except in two narrow instances: (1) multimember agencies that do not wield executive power; and (2) certain inferior officers. *Seila Law*, 140 S. Ct. at 2199–2200.

77.  Board Members do not fall under either exception to the President's removal power.

78.  Board Members are principal officers wielding substantial executive

power. This includes the power to promulgate binding rules, to enforce the law through adjudicating unfair labor practice disputes and issuing remedies, to issue subpoenas, to adjudicate representation proceedings, and to issue and revoke union certifications.

79. *Humphrey's Executor* does not compel a different result; the narrow exception for quasi-legislative agencies that do not wield substantial executive power does not apply to the NLRB, given the substantial executive authority it exercises. Should *Humphrey's Executor* apply, it must be overruled.

80. NLRA Section 3 violates the separation of powers because it limits the President's ability to remove Board Members to instances of "neglect of duty or malfeasance in office, but for no other cause." 29 U.S.C. § 153(a).

81. The "structural principles secured by the separation of powers protect the individual," *Bond v. United States*, 564 U.S. 211, 222 (2011), and are "critical to preserving liberty," *Free Enterprise Fund*, 561 U.S. at 501; *see Collins*, 141 S. Ct. at 1780. As a result, the Supreme Court "ha[s] long permitted private parties aggrieved by an official's exercise of executive power to challenge the official's authority to wield that power while insulated from removal by the President." *Seila Law*, 140 S. Ct. at 2196; *see Collins v. Yellen*, 141 S. Ct. 1761, 1780 (2021) ("whenever a separation-of-powers violation occurs, any aggrieved party with standing may file a constitutional challenge.").

82. Structural separation-of-powers violations inflict here-and-now injuries. *Axon*, 143 S. Ct. at 903; *Seila Law*, 140 S. Ct. at 2196 (parties alleging injury resulting

from appearing before an unconstitutionally structured agency have standing to challenge removal restrictions because "when such a provision violates the separation of powers it inflicts a 'here-and-now' injury . . . that can be remedied by a court") (quoting *Bowsher v. Synar*, 478 U.S. 714, 727 n.5 (1986)).

83. Separation of powers injuries can be remedied by a court through "declaratory relief sufficient to ensure that the . . . requirements and . . . standards to which they are subject will be enforced only by a constitutional agency accountable to the Executive." *Free Enter. Fund*, 561 U.S. at 513; *see also Seila Law*, 140 S. Ct. at 2196; *Collins*, 141 S. Ct. at 1779; *see also Collins v. Mnuchin*, 938 F.3d 553 (5th Cir. 2019) (en banc) (approving of "prospective relief" in the form of a "declaration" that a removal restriction is unconstitutional).

84. The Board's unconstitutional structure has inflicted and continues to inflict injury on Mudd, a petitioner in an on-going Board proceeding. Mudd has a constitutional right to have his case adjudicated and decided by a constitutionally structured agency.

85. Without interim injunctive relief from this Court, Mudd will have to vindicate his rights before Board Members insufficiently accountable to the President.

86. Mudd bears a strong likelihood of success on this claim for the reasons described above.

87. Furthermore, if Board Members rule on Mudd's request for review, or any subsequent request for reinstatement, the constitutional harm of appearing before

an unconstitutionally structured agency will be irremediable because "that injury is impossible to remedy once the proceeding is over." *Axon*, 143 S. Ct. at 903. Moreover, there is currently no post litigation remedy because the Supreme Court has stated those appearing before improperly insulated government officials often have no automatic right to vacate those decisions. *Collins*, 141 S. Ct. at 1787–89. Unless the NLRB is enjoined from acting on Mudd's request for review or a future request for reinstatement before the end of this lawsuit, Mudd will be irreparably harmed because he cannot ensure he is entitled to a constitutional proceeding to vindicate his rights after the fact.

88. Mudd does not seek to void any past decision of the Board. Rather, he seeks a declaration *before* the Board rules or otherwise acts on his request for review or future request for reinstatement. Mudd is "entitled to declaratory relief sufficient to ensure that the [administrative] standards to which [he is] subject will be enforced only by a constitutional agency accountable to the Executive." *Free Enterprise Fund*, 561 U.S. at 513.

89. The harm to Mudd is not outweighed by any countervailing harm or inconvenience to the NLRB, and in any event the balance of equities and public interest factors merge when the Defendant is the government. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

90. Injunctive and declaratory relief will serve the public interest, because "there is a substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations." *League of Women Voters of*

*U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016).

91. Without proper relief, Mudd is being required to adjudicate his case before an unconstitutionally structured agency that is insufficiently accountable to the President. Mudd's injuries are traceable to the Board's structure because he is forced to appear before the Board to obtain relief in his unfair labor practice charge.

Plaintiff requests that this Court:

A. Declare the removal restrictions for Board Members in 29 U.S.C. § 153(a) violate Article II of the Constitution;

B. Preliminary enjoin the Defendants from ruling on Mudd's Request for Review or any request for reinstatement of the decertification petition pending final resolution of this action;

C. Grant Plaintiff any other relief this Court deems just and proper.

October 30, 2024

Respectfully submitted,


Aaron Solem (*pro hac to be filed*)
MN Bar No. 0392920
VA Bar No. 100116
c/o National Right to Work Legal Defense
Foundation, Inc.
8001 Braddock Road, Suite 600
Springfield, VA  22160
(703) 321-8510 (phone)
(703) 321-9319 (fax)
abs@nrtw.org

/s/ Matthew D. Hill
Matthew D. Hill, Of Counsel
State Bar No. 24032296
Pryor & Bruce
302 N. San Jacinto
Rockwall, TX 75087
(972) 771-3933 (phone)
(972) 771-8343 (fax)
mhill@pryorandbruce.com

*Attorneys for Plaintiff Dallas Mudd*

# Exhibit A

UNITED STATES OF AMERICA
BEFORE THE NATIONAL LABOR RELATIONS BOARD
REGION 16

**AUNT BERTHA, A PUBLIC BENEFIT**
**CORPORATION D/B/A FINDHELP**

      **Employer**

    **and**                      **Case 16-RD-351569**

**AN INDIVIDUAL**

      **Petitioner**

    **and**

**OFFICE AND PROFESSIONAL EMPLOYEES**
**INTERNATIONAL UNION**

      **Union**

## ORDER DISMISSING PETITION

On September 27, 2024, the Petitioner filed a Petition seeking to decertify the Office of Professional Employees International Union (Union) as the exclusive collective-bargaining representative of the following appropriate unit of employees (Unit) employed by Aunt Bertha, A Public Benefit Corporation d/b/a Findhelp (Employer):

**INCLUDED:** Account Executive; Associate Principal, Customer Success; Business Analyst; Business Intelligence Analyst; Business Intelligence Associate; Cloud Database Administrator; Commercial Paralegal; Community Engagement Manager; Community Engagement Manager – California; Community Engagement Manager – Indiana; Community Engagement Manager - New England; Community Engagement Manager – Southwest; Community Engagement Manager – Texas; Community Engagement Marketing Strategist; Curator; Curator Research Specialist; Customer Engagement Marketing Strategist; Customer Happiness Executive; Customer Success Manager; Customer Success Manager-Schoolcare; Customer Support Manager; Customer Support Specialist; Customer Training Manager; Data Analyst; Data Engineer; Data Engineer I; Digital Marketing Manager; Engineer; Engineer I; Executive Administrative Assistant; Government Sales; Account Executive; IT Support Admin; Lead UI/Integration Designer; Learning and Development Specialist; National Community Engagement Manager; Network Support Analyst; Network Support Analyst I; Network Support Analyst II; Northeast Organization Onboarding Specialist (OOS); Office Administrator; Operations Specialist; Organization Onboarding Specialist – Southwest; Principal Business Analyst; Principal Curator Specialist; Product

1

Manager; Product Owner; Production Coordinator; Production Support Analyst; Production Support Engineer; Program Manager; Project Manager; QA Engineer; Regional Director of State Government-Relations; Research Analyst; RFP Specialist; School Partnership Executive-Sales; Scrum Master; Senior Account Executive; Senior Business Intelligence Analyst; Senior Cloud Infrastructure Engineer; Senior Community Engagement Manager; Senior CSM; Senior Customer Success Manager; Senior Executive Assistant; Senior Financial Analyst; Senior Marketplace Analyst; Senior Partnership Analyst; Senior Policy Analyst; Senior Product Manager; Senior QA Engineer; Senior Site Reliability Engineer; Senior Software Engineer; Senior Staff Data Engineer; Senior Staff Engineer; Senior Staff Software Engineer; Senior Technical Writer; Software Engineer; Software Engineer I; Software Engineer II; Sr. Manager, Business Development; Staff Data Engineer; Staff Engineer; Staff Production Support Engineer; Staff Quality Engineer; Staff Software Engineer; Staff Technical Solutions Engineer; User Experience Designer; User Experience Generalist; Director of Government Relations; and Channel Partner Manager.

**EXCLUDED**: Director of Culture, Organizational and Leadership Development; People Operations Administrator; Senior Security Analyst; Talent Acquisition Specialist; all other employees including independent contractors, managerial, temporary, confidential, guards, and supervisors as defined in the Act.

For the reasons discussed below, I am dismissing the petition pursuant to *Rieth-Riley Construction Co., Inc.*, 371 NLRB No. 109 (2022) and, alternatively, *Master Slack*, 271 NLRB 78 (1984), subject to reinstatement upon Petitioner's request, if appropriate, after the final disposition of the pending unfair labor practice charges against the Employer.

<u>**Facts**</u>

On October 2, 2024, I issued an Order to Show Cause asking the Parties to submit their positions on whether the instant petition should be dismissed pursuant to *Rieth-Riley Construction Co., Inc.*, supra., subject to reinstatement based on the unfair labor practices found in Cases 16-CA-319893 and 16-CA-329129 and/or whether the unfair labor practices alleged in Cases 16-CA-311267, 16-CA-312143, 16-CA-313516, 16-CA-318102, 16-CA-318170, 16-CA-319893, and 16-CA-329129, if proven, would have caused the employee disaffection underlying the decertification petition. See *Master Slack Corp.*, supra.

The Employer, the Union, and the Petitioner submitted positions in response to the Order. As discussed in further detail below, the Employer and the Petitioner urge that the petition continue to be processed and, absent such, that the Region conduct a *Saint Gobain*[1] hearing to address the potential causal nexus between alleged conduct and loss of support for the Union. The Union contends that the petition should be dismissed.

---

[1] 342 NLRB 434 (2004).

After carefully reviewing the parties' positions, the relevant law, and the circumstances of this case, I have concluded that the unfair labor practices found to be meritorious in the cases referenced above warrant dismissal of this petition, subject to reinstatement of the petition after disposition of the pending unfair labor practice cases.

## The Positions of the Parties

### Employer's Position

The Employer asserts that the Region should expedite the processing of the petition pursuant to the Board's 2020 Election Protection Rule. The Employer asserts that, alternatively, the Region hold a *Saint Gobain* hearing to make an informed and fact-based determination as to whether the alleged unfair labor practices cited have a causal nexus to the employees' disaffection and the decision to file the petition. The Employer argues that under the factors in *Master Slack*, there is no causal nexus with employee disaffection because of the length of time between the alleged unfair labor practices and the filing of the petition and the allegations were not hallmark violations, such as the ones that led to the dismissal of the petition in *Rieth-Riley*.

### Petitioner's Position

The Petitioner contends that the Region should continue processing the decertification petition. The Petitioner asserts that any adverse action taken on the instant petition without a hearing denies Petitioner due process and employees their right to an election. The Petitioner argues further that to the extent *Rieth-Riley,* supra, provides a rationale for dismissal in this matter, it contradicts the Board's Rules and Regulations and the Election Protection Rule. The Petitioner is unaware of and not a party to the unfair labor practice cases referenced in the Region's Order to Show Cause. The Petitioner argues that the petition cannot be dismissed based upon unproven bargaining order allegations and an affirmative bargaining order being sought. The Petitioner asserts that the allegations in Case Nos. 16-CA-311267, 16-CA-312143, 16-CA-313516, 16-CA-318102, 16-CA-318170, 16-CA-319893, and 16-CA-32912 do not support a causal nexus finding in disaffection for the Union pursuant to *Master Slack,* supra. The Petitioner also seeks a *Saint Gobain* hearing, which would allow Petitioner the opportunity to address the specific allegations and participate in developing the record. Finally, in a footnote, the Petitioner contends that the Board is unconstitutionally structured.

### Union's Position

The Union asserts the instant petition should be dismissed because the Employer's widespread unfair labor practices have tainted the petition and caused employee disaffection. The Union argues that the Board's decision in *Rieth-Riley* supports dismissal of the instant matter because an affirmative bargaining order would be sought by the General Counsel. The Union also argues that the *Master Slack* factors, as applied to the instant petition, support a causal nexus finding between the pending unfair labor practices and the filing of the petition.

**Complaint Allegations**

On April 12, 2024, I issued an Order Consolidating Cases, Consolidated Complaint and Notice of Hearing in Cases 16-CA-311267, 16-CA-312143, and 16-CA-313516, alleging, *inter alia,* that the Employer violated Section 8(a)(3) and (1) of the Act by discharging two employees because of their union and/or protected concerted activities; engaging in surveillance and/or creating an impression that employees' union and/or protected concerted activities were under surveillance; selectively and disparately enforcing its employment policies to prohibit union solicitations; prohibiting employees from talking about the union during working time; blocking union-related content from the Employer's e-mail system; deleting a Google Chat channel to remove union-related posts; and prohibiting employees from using the Employer's electronic communication systems to discuss the union.

On September 6, 2024, I issued an Order Further Consolidating Cases, Second Consolidated Complaint and Notice of Hearing adjoining the Consolidated Complaint in Cases 16-CA-311267, 16-CA-312143, and 16-CA-313516 with Cases 16-CA-318102 and 16-CA-318170. The Second Consolidated Complaint includes, in addition to the allegations described above, allegations that the Employer violated Section 8(a)(3) and (1) of the Act by terminating an employee because of the employee's union and/or protected concerted activities; and issuing and maintaining Severance Agreements with employees including Non-Disparagement, Confidentiality, and Cooperation policies that interfere with, restrain, and coerce employees in the exercise of rights guaranteed in Section 7 of the Act.

In addition, in Cases 16-CA-319893 and 16-CA-329129, I have further determined that post-certification, the Employer violated Section 8(a)(5) and (1) of the Act by refusing to bargain in good faith with the Union over changes in terms and conditions of employment, including the unilateral implementation of the Return-to-Office policy and unilaterally changing health insurance providers, respectfully. A Complaint is pending issuance in these cases. In order to remedy the violations of the Act, the Complaint will seek, inter alia, an affirmative bargaining order and an extension of the certification year pursuant to *Mar-Jac Poultry Co.*, 136 NLRB 785 (1962).

**Analysis**

In *Rieth-Riley Construction Co., Inc*., the Board determined that § 103.20 of the Board's Rules and Regulations preserved merit-determination dismissals of representation petitions, notwithstanding changes made to the Board's election procedures in 2020. 371 NLRB, slip op. at 2-4 (2022). The Board defined "merit-determination dismissals" as those situations where a Regional Director elects "to dismiss a representation petition, subject to reinstatement, when the Regional Director (on behalf of the General Counsel) has found merit in an unfair labor practice charge involving misconduct that would irrevocably taint the petition and any related election. Id.

The instant petition was filed during the pendency of the unfair labor practice cases referenced above. For the reasons that follow, I conclude that the instant Petition should be dismissed because: (1) there was a "causal nexus" between the Employer's alleged unfair labor practices and the employee disaffection underlying the decertification petition, and (2) regardless

4

of any "causal nexus," the Complaint will seek an affirmative bargaining order precluding a finding that a question concerning representation existed at the time of the filing of the petition.

The Board has long held that it "generally will dismiss a representation petition, subject to reinstatement, where there is a concurrent unfair labor practice complaint alleging conduct that, if proven, (1) would interfere with employee free choice in an election, and (2) is inherently inconsistent with the petition itself." *Overnite Transportation Co*., 333 NLRB 1392, 1392-93 (2001). However, "[w]here a case involves unfair labor practices other than a general refusal to recognize and bargain, a causal connection must be shown between the unfair labor practices and the subsequent employee disaffection with the union in order to find that a decertification petition is tainted." Id., 333 NLRB at 1393 (citations omitted).

The Board applies a multi-factor test to determine whether a causal nexus exists between an employer's unfair labor practices, as alleged, and the subsequent loss of support for an incumbent union. Id., 333 NLRB at 1393. These factors, outlined by the Board in *Master Slack Corp.*, 271 NLRB 78 (1984), include:

> (1) The length of time between the unfair labor practices and the withdrawal of recognition or filing of the petition; (2) the nature of the illegal acts, including the possibility of their detrimental or lasting effect on employees; (3) any possible tendency to cause employee disaffection from the union; and (4) the effect of the unlawful conduct on employee morale, organizational activities, and membership in the union.

In addition to the legal rationale pursuant to Board decisions *Rieth-Riley* and *Overnite Transportation* as described above, dismissal of the petition is required where the General Counsel seeks a *Mar-Jac* remedy. In *Mar-Jac Poultry Co.*, supra, the Board held that an employer's refusal to bargain during the one-year certification period set forth in Section 9(c)(3) of the Act[2] warrants extension of the certification year. The Board noted that allowing the certification year to lapse while an employer has delayed and undermined the bargaining process "would be to allow it to take advantage of its own failure to carry out its statutory obligation, contrary to the very reasons for the establishment of the rule that a certification requires bargaining for at least 1 year." *Id.*

Initially, regarding the first factor under *Master Slack*, i.e., the length of time between the unfair labor practices and the filing of petition, while the conduct described above occurred in 2023, these unfair labor practices remain unremedied and preclude a question concerning representation. "Serious unremedied unfair labor practices" that "tend to produce disaffections from a union" will preclude a question of representation because under such circumstances, there is no basis to demonstrate free choice on the part of employees. *Olson Bodies, Inc.*, 206 NLRB 779, 779-780 (1973).

Here, the Employer's unremedied unfair labor practices described above are serious, with lasting impact on employees such that the Union's majority status cannot be questioned. Notably, "[d]iscriminatory discharges of employees because of their union activities strike at the very heart of the Act." *Id*. at 779. It is well-settled that such conduct has a "lasting impact, including the

---

[2] Section 9(c)(3) states, in pertinent part, that "[n]o election shall be directed in any bargaining unit or any subdivision within which, in the preceding twelve-month period, a valid election shall have been held…."

likelihood of . . . causing employees to defect from unions and the tendency to undermine a union's majority status by discouraging union membership and deterring organizational activity[.]" *Id*. At the same time, the Employer conveyed futility of union representation by refusing to bargain in good faith with the Union by unilaterally changing significant terms and conditions of employment affecting all Unit employees. This conduct would also likely cause disaffection and undermine the Union's majority status as employees were subject to significant changes in their working conditions, including their benefits, without the Employer's collective-bargaining with the Union.

In applying the second and third *Master Slack* factors, i.e., the nature of the alleged illegal conduct, including any possible detrimental or lasting effect on employees, and any possible tendency to cause employee disaffection from the union, the Employer's unfair labor practices are of such a scale and quality that they would inevitably cause employees to believe that the Union was ineffective in representing the Unit. Even assuming, *arguendo,* that some of the Employer's alleged unlawful conduct is remote, the Employer has not remedied any of the violations; therefore, the effects are still present. The Employer's acts unquestionably would cause disaffection with the Union and have a deleterious effect on employee morale, organizational activities, and membership in the Union.

The merit finding of the allegations in Cases 16-CA-319893 and 16-CA-329129 involve violations of § 8(a)(5) and (1) of the Act by failing to bargain in good with the Union by unilaterally implementing the Return-to-Office policy and unilaterally changing health insurance providers. The issuance of a formal complaint in these matters is imminent. The Board has held that an affirmative bargaining order is an appropriate remedy for such a violation. See, e.g., *Columbus Elec. Coop., Inc*., 372 NLRB No. 89, slip op. at 2 (2023), quoting *Caterair Int'l*., 322 NLRB 64, 68 (1996); *Noah's Ark Processors, LLC d/b/a WR Reserve*, 372 NLRB No. 80, slip op. at 3 n.9 (2021); *Kalthia Group Hotels, Inc*., 366 NLRB No. 118, slip op. at 2 (2018).  Thus, if the Complaint allegations are proven, the appropriate remedy would include an affirmative bargaining order and a corresponding decertification bar; this means a question concerning representation at the time the petition was filed would be precluded.  See *Big Three Indus*., 201 NLRB 197 (1973).

I have determined that the Employer's previous conduct in Case 16-CA-311267, *et al*. and the recent conduct as described above reveal a systematic effort to undermine the Union and that the effects of those actions continue to be present: employees have been discharged; the Employer has engaged in surveillance and/or created an impression that employees' union and/or protected concerted activities were under surveillance; employees have been prohibited from talking about the Union during working time; the Employer has blocked union-related content from the Employer's e-mail system and deleted a Google chat channel to remove union-related posts; the Employer has prohibited employees from using the Employer's electronic communication systems to discuss the Union; and has failed to bargain in good faith by unilaterally changing employees' working conditions.

The totality of the Employer's alleged misconduct including, but not limited to, its failure to bargain with the Union before unilaterally changing employees' terms and conditions of employment before the filing of the Petition in this matter warrants finding a casual nexus.  In *Coreslab Structures (Tulsa) Inc*., 372 NLRB No. 31, slip op. at 10 (2022) (footnote omitted), the Board noted that employees' ongoing "concern about their benefits reasonably would have been at the forefront of employees' minds at the time the petition was circulating."

As to the final *Master Slack* factor, the effect of the unlawful conduct on employee morale, I find that it, too, is sufficiently present. As stated previously, Board has held that the *Master Slack* test "is an objective one" and that "the relevant inquiry … does not ask employees why they chose to reject the Union." *Saint Gobain*, 342 NLRB at 434 n.2 (emphasis in original). Here, the Employer's unilateral actions were calculated to discourage support for the Union representing its employees. All charge allegations directly impacted the entire Unit and projected a message that the Union was powerless to do anything for the Unit employees. The Employer's unfair labor practices are of such a scale and quality that they would inevitably cause employees to believe their elected Union is ineffective in representing the Unit, even though the Union's inability to represent employees was caused by the Employer's unilateral action and refusal to bargain. In turn, such conduct, if proven, frustrated the collective-bargaining process, and would undoubtedly impact employee morale.

The Employer and the Petitioner both argue the instant petition cannot be dismissed without a *Saint Gobain* hearing. In some cases, it may be necessary to conduct an evidentiary hearing to gather testimony and evidence pursuant to the Board's decision in *Saint Gobain Abrasives*, 342 NLRB 434 (2004). However, "in the 18 years that have elapsed since the [this] decision, … the Board has consistently signaled that *Saint Gobain* does not necessarily require a hearing in every case." *Rieth-Riley*, 371 NLRB, slip op. at 6 & n.31 (collecting cases). Instead, "casual nexus determinations may be made as a matter of law, where appropriate." Id., 371 NLRB, slip op. at 6, citing *Overnite Transportation*, 333 NLRB at 1392. As such, I am denying the request for an evidentiary hearing in this matter.

Based on the Employer's above cited unfair labor practices[3] precluding a question concerning representation and causing employee disaffection with the Union, the petition cannot be processed further. Accordingly, I am dismissing the petition pursuant to *Rieth-Riley* and, alternatively, *Master Slack*, subject to reinstatement upon Petitioner's request, if appropriate, after the final disposition of the charges.

In a footnote in the position statement, the Petitioner submitted the affirmative defense claim that the removal protections Congress granted to Board members are unconstitutional. This affirmative defense fails because the Petitioner has not shown or even alleged that those removal protections caused any harm. *See SJT Holdings, Inc.*, 372 NLRB No. 82, slip op. at 1 n.4 (2023) (citing *Collins v. Yellen*, 141 S. Ct. 1787, 1787 (2021), and *Calcutt v. FDIC*, 37 F.4th 293, 316 (6th Cir. 2022), *rev'd per curiam on other grounds*, 598 U.S. 623 (2023)); *YAPP USA Auto. Sys., Inc. v. NLRB*, No. 24-12173, 2024 WL 4119058, at *9-10 (E.D. Mich. Sept. 9, 2024) (applying causal-harm standard to reject constitutional challenge to removal protections enjoyed by Board members and administrative law judges), *appeal docketed*, No. 24-1754 (6th Cir. Sept. 9, 2024);

---

[3] On October 3, 2024, the Union filed Case 16-CA-352130 against the Employer alleging, in part, that the Employer solicited employees to sign the decertification petition through an agent. Section 103.20(c) of the Rules and Regulations provides that paragraph (c) charges are those that challenge the circumstances surrounding the petition or the showing of interest in support of the petition. Case 16-CA-352130 appears on its face to be a paragraph (c) charge, and under the 2020 Board Rules, with the instant petition filed on September 27, 2024, and a request to block, the election would normally proceed with the ballots being impounded up to 60 days following an election until there is a final determination on the merits of the unfair labor practice allegations. Because I am dismissing the petition as described in this Order, it is unnecessary to apply the Board's 2020 Rules to the petition.

*Cortes v. NLRB*, No. 1:23-cv-02954, 2024 WL 1555877, at *7 (D.D.C. Apr. 10, 2024) (declining to address the constitutionality of Board members' removal protections because "the Court could 'dispose of the case' on the harm requirement" (quoting *Bond v. United States*, 572 U.S. 844, 855 (2014))), *appeal docketed*, No. 24-5152 (D.C. Cir. June 10, 2024). Furthermore, "Supreme Court precedent recognizing that Congress may establish expert agencies like the Board, led by a group of principal officers and removable by the President only for good cause, forecloses [any] claim" that the Act unconstitutionally shields Board members from removal. *SJT Holdings*, above, at 1 (citing *Humphrey's Ex'r v. United States*, 295 U.S. 602 (1935)).

## ORDER

**IT IS HEREBY** ordered that the Petition in this matter is dismissed, subject to reinstatement, pending the resolution of the unremedied unfair labor practices, as alleged.

## RIGHT TO REQUEST REVIEW

Pursuant to Section 102.67 of the National Labor Relations Board's Rules and Regulations, you may obtain a review of this action by filing a request with the Executive Secretary, National Labor Relations Board, 1015 Half Street SE, Washington, DC 20570-0001. A copy of the request for review must be served on each of the other parties, as well as on the undersigned, in accordance with the requirements of the Board's Rules and Regulations. The request for review must contain a complete statement of the facts and reasons on which it is based.

***Procedures for Filing Request for Review*: Pursuant to Section 102.5 of the Board's Rules and Regulations, a request for review must be filed by electronically submitting (E-Filing) it through the Agency's web site ([www.nlrb.gov](www.nlrb.gov)), unless the party filing the request for review does not have access to the means for filing electronically or filing electronically would impose an undue burden.** A request for review filed by means other than E-Filing must be accompanied by a statement explaining why the filing party does not have access to the means for filing electronically or filing electronically would impose an undue burden. Section 102.5(e) of the Board's Rules do not permit a request for review to be filed by facsimile transmission. A copy of the request for review must be served on each of the other parties to the proceeding, as well as on the undersigned, in accordance with the requirements of the Board's Rules and Regulations. The request for review must comply with the formatting requirements set forth in Section 102.67(i)(1) of the Board's Rules and Regulations. Detailed instructions for using the NLRB's E-Filing system can be found in the [E-Filing System User Guide](E-Filing System User Guide).

A request for review must be received by the Executive Secretary of the Board in Washington, DC, by close of business **(5 p.m. Eastern Time)** on **October 23, 2024**, unless filed electronically. If filed electronically, it will be considered timely if transmission of the entire document through the Agency's website is **accomplished by no later than 11:59 p.m. Eastern Time** on **October 23, 2024.**

Filing a request for review electronically may be accomplished by using the E-Filing system on the Agency's website at [www.nlrb.gov](www.nlrb.gov). Once the website is accessed, click on **E-File Documents**, enter the NLRB Case Number, and follow the detailed instructions. The responsibility for the receipt of the request for review rests exclusively with the sender. A failure

to timely file the request for review will not be excused on the basis that the transmission could not be accomplished because the Agency's website was off line or unavailable for some other reason, absent a determination of technical failure of the site, with notice of such posted on the website.

Upon good cause shown, the Board may grant special permission for a longer period within which to file a request for review.  A request for extension of time, which must also be filed electronically, should be submitted to the Executive Secretary in Washington, and a copy of such request for extension of time should be submitted to the Regional Director and to each of the other parties to this proceeding.  A request for an extension of time must include a statement that a copy has been served on the Regional Director and on each of the other parties to this proceeding in the same manner or a faster manner as that utilized in filing the request with the Board.

Any party may, within 5 business days after the last day on which the request for review must be filed, file with the Board a statement in opposition to the request for review. An opposition must be filed with the Board in Washington, DC, and a copy filed with the Regional Direction and copies served on all the other parties. The opposition must comply with the formatting requirements set forth in §102.67(i)(1).  Requests for an extension of time within which to file the opposition shall be filed pursuant to §102.2(c) with the Board in Washington, DC, and a certificate of service shall accompany the requests. The Board may grant or deny the request for review without awaiting a statement in opposition. No reply to the opposition may be filed except upon special leave of the Board.

**DATED** at Fort Worth, Texas, this 9th day of October 2024.

Timothy L. Watson
Regional Director
National Labor Relations Board
Region 16
819 Taylor Street, Room 8A24
Fort Worth, Texas  76092

9

# Exhibit B

UNITED STATES OF AMERICA
BEFORE THE NATIONAL LABOR RELATIONS BOARD
REGION 16

**AUNT BERTHA, A PUBLIC BENEFIT
CORPORATION D/B/A "FINDHELP"**

**Respondent**

**and**                                    **Cases 16-CA-311267
                                              16-CA-312143
                                              16-CA-318102
                                              16-CA-318170**

**OFFICE AND PROFESSIONAL EMPLOYEES
INTERNATIONAL UNION, AFL-CIO**

**Charging Party**

**and**                                    **Case  16-CA-313516**

**THOMAS ROSENWINKEL, an Individual**

## ORDER FURTHER CONSOLIDATING CASES, SECOND CONSOLIDATED COMPLAINT AND NOTICE OF HEARING

On April 12, 2024, a Consolidated Complaint and Notice of Hearing issued in Cases 16-CA-311267, 16-CA-312143, and 16-CA-313516 alleging that Aunt Bertha, a Public Benefit Corporation d/b/a "findhelp" (Respondent) had engaged in unfair labor practices that violate the National Labor Relations Act (the Act), 29 U.S.C. § 151 et seq. Pursuant to Section 102.33 of the Rules and Regulations of the National Labor Relations Board (the Board) and to avoid unnecessary costs or delay, IT IS ORDERED THAT those cases are further consolidated with Cases 16-CA-318102 and 16-CA-318170 which are based on charges filed by Office and Professional Employees International Union, AFL-CIO (Charging Party) which allege that Respondent has engaged in further unfair labor practices within the meaning of the Act .

This Order Further Consolidating Cases, Second Consolidated Complaint and Notice of Hearing, which is based on these charges, is issued pursuant to Section 10(b) of the National Labor Relations Act (the Act), 29 U.S.C. § 151 et seq., and Section 102.15 of the Board's Rules and Regulations, and alleges Respondent has violated the Act as described below.

**1.**

(a)     The charge in Case 16-CA-311267 was filed by the Charging Party on January 30, 2023, and a copy was served on the Respondent by U.S. mail on February 1, 2023.

(b)     The charge in Case 16-CA-312143 was filed by the Charging Party on February 13, 2023, and a copy was served on the Respondent by U.S. mail on February 15, 2023.

(c)     The charge in Case 16-CA-313516 was filed by Rosenwinkel on March 6, 2023, and a copy was served on the Respondent by U.S. mail on March 7, 2023.

(d)     The Charge in Case 16-CA-318102 was filed by the Charging Party on May 10, 2023, and a copy was served on the Respondent by U.S. mail on May 16, 2023.

(e)     The Charge in Case 16-CA-318170 was filed by the Charging Party on May 12, 2023, and a copy was served on the Respondent by U.S. mail on May 17, 2023.

**2.**

At all material times, Respondent has been a Delaware corporation with multiple offices and places of business in the United States, including an office and principal place of business located at 3429 Executive Center Dr., Suite 100 Austin, Texas 78731 (Austin facility) where it is engaged in the building and maintaining of technology for social care networks and databases across the United States.

**3.**

During the last twelve months, a representative period, Respondent, in conducting its business and operations, performed services valued in excess of $50,000 for customers located in States outside the State of Texas.

**4.**

At all material times, Respondent has been an employer engaged in commerce within the meaning of Section 2(2), (6), and (7) of the Act.

**5.**

At all material times, the Charging Party has been a labor organization within the meaning of Section 2(5) of the Act.

**6.**

At all material times, the following individuals held the positions set forth opposite their names and have been supervisors of Respondent within the meaning of Section 2(11) of the Act and/or agents of Respondent within the meaning of Section 2(13) of the Act:

| | |
|---|---|
| Erine Gray | President and Chief Executive Officer |
| Jaffer Traish | Chief Operating Officer |
| Jay Painter | Vice President of People Operations |
| Richard Saunders | Deputy CISO - Information Security Manager |
| Paige Litterer | Director of Data Operations |
| Antonia Airriess | Manager, Curation |
| Jaclyn Bernard | Director, Analytics and Data Equity |
| Evan Henderson | Vice President of Products |
| Kelly Bell | Executive Assistant |

**7.**

(a)     On or about January 17, 2023 to date, Respondent, by Chief Operating Officer Jaffer Traish, by joining a virtual Zoom meeting meant for employees to learn about the union created an impression among its employees that their union and/or protected concerted activities were under surveillance, and/or engaged in surveillance of employees engaged in union and/or protected concerted activities.

(b)     On or about January 17, 2023, Respondent, by Deputy CISO - Information Security Manager Richard Saunders, by joining and attempting to join a virtual Zoom meeting meant for employees to learn about the union gave employees the impression that their union and/or other protected concerted activities were under surveillance, and/or engaged in surveillance of these activities.

(c)     Beginning about January 2023, Respondent, by Deputy CISO - Information Security Manager Richard Saunders, created an impression among its employees that their union and/or protected concerted activities were under surveillance, and/or engaged in surveillance of employees engaged in union and/or protected concerted activities by blocking union-related content from being sent via Respondent's email system.

**8.**

(a)     At all material times, Respondent has maintained a Solicitation and Distribution Policy containing the following provisions:

> Findhelp prohibits the solicitation, distribution and posting of materials on or at Company property by any employee or non-employee, except as may be permitted by this policy. The sole exceptions to this policy are charitable and community activities supported by findhelp management.
>
> Non-employees may not solicit employees or distribute literature of any kind on findhelp's premises at any time. Employees may not solicit other employees during work times, except in connection with a Company approved or sponsored event.

> Employees may not distribute literature of any kind during work times, or in any work area at any time, except in connection with a Company-sponsored event.
>
> Violation of this policy should be reported to People Operations.

(b)     On or about January 24, 2023, Respondent, by Vice President of People Operations Jay Painter, enforced the rule described above in paragraph 8(a) selectively and disparately by prohibiting union solicitations, while permitting non-union solicitations, by causing an employee to remove post(s) about the union from a Google Chat channel maintained by Respondent.

**9.**

(a)     Beginning about January 2023 to date, Respondent, by Deputy CISO - Information Security Manager Richard Saunders, prohibited employees from talking about the union during working time while permitting employees to talk about other non-work subjects by blocking union-related content from being sent via Respondent's e-mail system.

(b)     On or about January 24, 2023, Respondent, by Vice President of People Operations Jay Painter at the Austin facility, prohibited employees from talking about the union during working time while permitting employees to talk about other non-work subjects.

(c)     On or about January 24, 2023, Respondent, by Information Security Manager Richard Saunders, prohibited employees from talking about the union during working time while permitting employees to talk about other non-work subjects by deleting an entire Google Chat channel to remove union-related posts.

(d)     On or about January 27, 2023, Respondent, by Executive Assistant Kelly Bell at the Austin facility, prohibited employees from talking about the union during working time while permitting employees to talk about other non-work subjects.

5

(e)     Beginning about January 2023 to date, Respondent, by Vice President of People Operations Jay Painter and Information Security Manager Richard Saunders, at its Austin facility, prohibited employees from using Respondent's electronic communication systems to discuss the union.

**10.**

Beginning about August 2022 to date, Respondent, at its Austin facility, by installing and maintaining electronic monitoring software on employees' computers, created the impression among its employees that their union and/or protected concerted activities were under surveillance, and/or engaged in surveillance of employees engaged in union and/or protected concerted activities.

**11.**

(a)     About January 23, 2023, Respondent discharged employee Sanam Tiffany.

(b)     About February 10, 2023, Respondent discharged employee Matt Smith.

(c)     About February 10, 2023, Respondent discharged employee Mario Villareal-Diaz.

(d)     Respondent engaged in the conduct described above in paragraphs 11(a), (b), and (c) because Tiffany, Smith, and Villareal-Diaz formed, joined, and/or assisted the Charging Party and engaged in concerted activities, and/or to discourage employees from engaging in these or other concerted activities.

**12.**

Since about January 5, 2023, Respondent has issued and since maintained Severance Agreements with employees containing the following provisions:

**5.     Non-disparagement**. Employee agrees that they will not make any remark or statement, whether verbal or in writing, except where required by law, in any medium, including, but not limited to, Glassdoor, LinkedIn and social media, that reasonably may be construed as disparaging to any of the Released Parties. If Employee has made any

comments that reasonably could be construed as disparaging on any of these platforms, Employee agrees to remove it.

The Employer agrees that (i) should it receive an inquiry from a prospective employer it will only disclose Employee's final salary and dates of employment and will not make any other statement in response to such inquiry that would reflect poorly on Employee and (ii) the senior leadership team will not make any remark or statement, whether verbal or in writing, whether directly or indirectly that reasonably may be construed as disparaging to Employee.

**6.     Confidentiality.** Employee acknowledges that they will not discuss or disclose the contents of this Agreement or the details of this Agreement to any third party except as may be required by law. Notwithstanding the foregoing, Employee may disclose the details and the financial terms of the Agreement to their spouse, attorneys, or tax advisors as needed; provided, however, Employee agrees that if they disclose any such information to her spouse, attorneys or tax advisors, they will be held responsible for any breach of confidentiality by any such individuals. Moreover, the Parties agree that this Agreement and their respective promises as set forth in this Agreement are conditioned, in part, upon compliance with this Agreement and Paragraphs 5, 6, 7 and 11 of this Agreement, which the Parties agree are essential and material terms of this Agreement and that no settlement could have been reached without such terms. If Employee is required to disclose this Agreement, its terms or underlying facts pursuant to court order and/or subpoena, they shall notify Jay Painter, VP of People Operations for Aunt Bertha in writing via email (jpainter@findhelp.com) or mail, within 48 hours of their receipt of such court order or subpoena, and simultaneously provide him with a copy of such court order or subpoena. Employee agrees to waive any objection to any request by any of the Released Parties or Employee that the document production or testimony be done *in camera* and under seal.

**11.    Cooperation** . Employee shall cooperate fully with the Company in the defense or prosecution of any claims or actions now in existence or that may be brought in the future against or on behalf of the Company that relate to events or occurrences that transpired while Employee was employed by the Company. The Employee's full cooperation in connection with such claims or actions shall include, but not be limited to, being available to meet with counsel to prepare for discovery or trial and to act as a witness on behalf of the Company at mutually convenient times. Employee also shall cooperate fully with the Company in connection with any investigation or review of any federal, state or local regulatory authority as any such investigation or review relates to events or occurrences that transpired while the Employee was employed by the Company and in any other business transition matters. The Company shall reimburse the Employee for any reasonable out-of-pocket expenses incurred in connection with their performance of obligations pursuant to this Section.

**13.**

By the conduct described above in paragraphs 7, 8, 9, 10, and 12 Respondent has been interfering with, restraining, and coercing employees in the exercise of the rights guaranteed in Section 7 of the Act in violation of Section 8(a)(1) of the Act.

**14.**

By the conduct described above in paragraph 11, Respondent has been discriminating in regard to hire or tenure or terms or conditions of employment of its employees, thereby discouraging membership in a labor organization in violation of Section 8(a)(3) and (1) of the Act.

**15.**

The unfair labor practices of Respondent described above affect commerce within the meaning of Section 2(6) and (7) of the Act.

**16.**

**WHEREFORE** as part of the remedy for the Employer's unfair labor practices alleged above, the General Counsel seeks an Order requiring the Employer to take the following affirmative actions:

(a)  Send a letter of apology to Tiffany, Smith, and Villareal-Diaz for any hardship caused by the unlawful terminations and assurances that Respondent will take the necessary steps to ensure that the rights of all employees to engage in protected concerted activities under the Act are protected.  This letter of apology is to be sent by United States Mail and by electronic mail, with copies sent to the Regional Director for Region 16, and shall be on the Respondent's letterhead and signed by the Respondent;

(b)  Rescind any and all directives and disciplines Respondent issued to employees as a result of the selective and disparate enforcement of the rule described above in paragraph 8(a) at

any time since January 24, 2023, that targeted employee conduct that touches the concerns animating Section 7, and notify such employees, in writing, that this has been done and that the disciplines will not be used against them in any way and make whole those employees who suffered financial loss including direct or foreseeable pecuniary harms suffered, plus interest computed in accordance with Board policy, due to the discipline imposed related to the rules;

(c)     Post an Explanation of Rights on bulletin boards at Respondent's facility where it customarily posts such notices informing employees of their NLRA rights;

(d)     Electronically distribute an Explanation of Rights to all employees who are or have been employed by the Respondent since August 2022 by email and posting on internal applications;

(e)     Require all managers and supervisors to attend a training, conducted by a Board agent, on their obligations under the National Labor Relations Act. The date, time and location of the training is to be approved by the Regional Director of Region 16 in advance;

(f)     Have all non-managerial and non-supervisory employees who are currently employed by Respondent attend training, conducted by a Board agent, regarding the provisions of the National Labor Relations Act. The date, time and location of the training is to be approved by the Regional Director of Region 16 in advance;

(g)     Expunge and retract any disciplines, directives, legal enforcement actions or other actions issued to any employee or former employee pursuant to Respondent's unlawful Severance Agreements at any time since November 11, 2022;

(h)     Make whole any affected employee or former employee for any loss of wages and other benefits, and for any other direct or foreseeable pecuniary harms suffered because of discipline, directives, legal enforcement actions or other actions taken against them pursuant to the

9

Employer's unlawful severance agreements that were issued, enforced, or otherwise in effect at any time since November 11, 2022, plus interest computed in accordance with current Board policy, plus reasonable search-for-work and interim employment expenses; and

(i)     Include language in the standard remedial notice: (1) alerting employees that they may be entitled to a remedy if they were disciplined or subject to legal enforcement under the Employer's unlawful severance agreements at any time since November 11, 2022, and (2) directing impacted employees to contact the Regional office during the posting period.

**FURTHER**, the General Counsel seeks all other relief as may be just and proper to remedy the unfair labor practices alleged.

## ANSWER REQUIREMENT

Respondent is notified that, pursuant to Sections 102.20 and 102.21 of the Board's Rules and Regulations, it must file an answer to the complaint.  The answer must be **e-filed with this office on or before September 20, 2024.**  Respondent also must serve a copy of the answer on each of the other parties.

The answer must be filed electronically through the Agency's website.  To file electronically, go to www.nlrb.gov, click on **E-File Documents**, enter the NLRB Case Number, and follow the detailed instructions.  Responsibility for the receipt and usability of the answer rests exclusively upon the sender.  Unless notification on the Agency's website informs users that the Agency's E-Filing system is officially determined to be in technical failure because it is unable to receive documents for a continuous period of more than 2 hours after 12:00 noon (Eastern Time) on the due date for filing, a failure to timely file the answer will not be excused on the basis that the transmission could not be accomplished because the Agency's website was off-line or unavailable for some other reason.

The Board's Rules and Regulations require that an answer be signed by counsel or non-attorney representative for represented parties or by the party if not represented. See Section 102.21. If the answer being filed electronically is a pdf document containing the required signature, no paper copies of the answer need to be transmitted to the Regional Office. However, if the electronic version of an answer to a complaint is not a pdf file containing the required signature, then the E-filing rules require that such answer containing the required signature continue to be submitted to the Regional Office by traditional means within three (3) business days after the date of electronic filing. Service of the answer on each of the other parties must still be accomplished by means allowed under the Board's Rules and Regulations. The answer may not be filed by facsimile transmission. If no answer is filed, or if an answer is filed untimely, the Board may find, pursuant to a Motion for Default Judgment, that the allegations in the complaint are true.

## <u>NOTICE OF HEARING</u>

PLEASE TAKE NOTICE THAT on **September 23, 2024, at 9:00 a.m. at the Homer Thornberry Judicial Building, 903 San Jacinto Blvd., Room 1400, First Floor, Austin, Texas 78701**, and on consecutive days thereafter until concluded, a hearing will be conducted before an administrative law judge of the National Labor Relations Board. At the hearing, Respondent and any other party to this proceeding have the right to appear and present testimony regarding the allegations in this complaint. The procedures to be followed at the hearing are described in the attached Form NLRB-4668. The procedure to request a postponement of the hearing is described in the attached Form NLRB-4338.

**DATED** at Fort Worth, Texas on this 6th day of September, 2024.

_Timothy L. Watson_

Timothy L. Watson
Regional Director
National Labor Relations Board
Region 16
819 Taylor St., Rm. 8A24
Fort Worth, TX 76102-6107

Attachments

Exhibit C

                                                                    Dallas Mudd <dmudd@wgu.edu>

---

## Fwd: Update: NYC Health & Hospitals

---

**Dallas Mudd** <dmudd@findhelp.com>                                       Thu, Oct 24, 2024 at 8:54 PM
To: dmudd@wgu.edu

---------- Forwarded message ---------
From: **Erine Gray** <egray@findhelp.com>
Date: Tue, Aug 13, 2024 at 3:05 PM
Subject: Update: NYC Health & Hospitals
To: <team@findhelp.com>

Hello Team—

I want to update you on a recent situation that has come to our attention. Last week, we discovered that incomplete and potentially misleading information about our company was presented to our customer, NYC Health & Hospitals (NYC H&H).

This information was shared by representatives of the AFL-CIO, a federation of labor unions. The union representing our employees, the Office and Professional Employees International Union (OPEIU), is an affiliate member union of the AFL-CIO.

**The Status of Our Work for NYC Health & Hospitals**
Beginning in 2023, our ongoing partnership with NYC Health & Hospitals (NYC H&H) has been vital to us. NYC H&H is the largest municipal health system in the country, with over 43,000 navigators screening more than 250,000 patients annually for social needs.

Since our platform went live with them in late 2023, NYC H&H has seen significant engagement: over 10,000 staff and 20,000 patients have utilized our platform, resulting in 10,000 referrals and an impressive 97% closed-loop referral rate with their trusted partners. Additionally, NYC H&H is our first customer to pilot two innovative integrations - Automated Program Recommendations and Assessment-informed Launch - which many of you worked diligently to implement in early 2024. We are confident that our efforts will lead to substantial and lasting benefits for the New York Community.

At this point, we cannot predict the impact of the AFL-CIO's recent communications on our partnership with NYC H&H. However, we are committed to doing everything in our power to preserve and strengthen this crucial relationship. Our focus remains on supporting those in need throughout the New York City region and ensuring the continued success of our work with NYC H&H.

**Why is the AFL-CIO Doing This?**
While the exact objectives of the AFL-CIO remain unclear, we can gain insight from their publicly available statements and materials.

As described before a U.S. Senate Committee, an AFL-CIO guidebook "describes how a coordinated campaign involves applying pressure to a target company: It means seeking vulnerabilities in all of the company's political and economic relationships – with other unions, shareholders, customers, creditors and government agencies – to achieve union goals."

Additionally, it has been noted that corporate campaigns like this often seek to generate public hostility and create external pressures, distinguishing them from traditional labor-management disputes.

We will continue to navigate this situation with focus and integrity, keeping our commitment to our customers and mission at the forefront.

**Efforts to Hurt Findhelp Won't Help Anyone**
Since April 11, 2023, when employees chose to pursue union representation, I have largely refrained from discussing the topic in detail out of respect for that decision. I recognize that the choice to involve an external representative was made by a majority at that time, and we have honored it.

However, recent events compel me to address a critical issue: efforts aimed at damaging the company or undermining our operations will not benefit anyone. They will not help the company or any of us who work here, and it certainly won't help seekers and those we serve.

In March, our investors began receiving hundreds of boilerplate emails regarding our contract negotiations, which we learned is a common union tactic. The recent outreach by the AFL-CIO to our customers may be a continuation or escalation of this strategy.  I struggle to see how any of this will positively impact Findhelp, our employees, or those we serve.

**Findhelp's Focus Will Not Change**
We are dedicated to advancing our mission by simplifying the safety net for those who need it most.

Regarding the union, we are committed to negotiating in good faith for a contract that benefits Findhelp, our employees, and our business. We have invested significant time, energy, and resources into these negotiations. I want to commend Rachel Thomas and Jay Painter, and our legal team for their hard work. Their preparation and professionalism throughout our negotiations represent our commitment to this process.

**Recognizing the Dedication of Our Employees**
Despite challenges like the pandemic, economic difficulties, and a polarized political climate, your dedication has been exemplary. We continue to grow, make an impact, and stand out in our sector. It's hard work and yet you show up every day to deliver on our promises.

Thank you for your hard work, dedication, focus, and professionalism.

As we face future challenges, open and honest communication remains crucial. My office hours are alway open for discussions with me or other members of the leadership team.

Thank you again for your commitment to Findhelp.

Take Care,
Erine

--

**Erine Gray**
President and CEO

512-795-4864 | company.findhelp.com

CONFIDENTIAL AND PROPRIETARY: This email message is intended only for the use of the individual or entity to which it is addressed and may contain information that is privileged and confidential. Unless specifically stated, it is not intended to be relied upon by any person or persons other than the individual or entity named above and no warranties or representations are made or intended to persons or entities not named above. If the reader is not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited, and any disclosure to the reader shall not compromise or waive the attorney-client, accountant-client, or other privileges as to this communication or otherwise. If you have received this communication in error, please notify us immediately by telephone, return this message to the address above and delete all copies.

--

**Dallas Mudd**
Senior Director, Partnerships

company.findhelp.com

CONFIDENTIAL AND PROPRIETARY: This email message is intended only for the use of the individual or entity to which it is addressed and may contain information that is privileged and confidential. Unless specifically stated, it is not intended to be relied upon by any person or persons other than the individual or entity named above and no warranties or representations are made or intended to persons or entities not named above. If the reader is not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited, and any disclosure to the reader shall not compromise or waive the attorney-client, accountant-client, or other privileges as to this communication or otherwise. If you have received this communication in error, please notify us immediately by telephone, return this message to the address above and delete all copies.